Pappas v B & G Holding Co. (2024 NY Slip Op 51218(U))

[*1]

Pappas v B & G Holding Co.

2024 NY Slip Op 51218(U)

Decided on September 6, 2024

Supreme Court, Bronx County

Gomez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 6, 2024
Supreme Court, Bronx County

Dean George Pappas, AS THE EXECUTOR OF THE ESTATE OF WILLIAM EGAN, AND DEAN GEORGE PAPPAS, INDIVIDUALLY, Plaintiff(s),

against
B & G Holding Co. D/B/A B & G HOLDING COMPANY, AND EUGENE LEOGRANDE, Defendant(s).

Index No. 35136/20E 

Plaintiffs' Counsel: The Ahearne Law Firm, PLLC
Defendants' Counsel: Piana & Gioe, LLC.

Fidel E. Gomez, J.

In this action for, inter alia, a corporate accounting, plaintiffs seek an order pursuant to CPLR § 3001, granting them a declaratory judgment, declaring, inter alia, that plaintiff DEAN GEORGE PAPPAS (Pappas) owns 50 percent of the shares of defendant B & G HOLDING CO. D/B/A B & G HOLDING COMPANY (B&G). Saliently, plaintiffs aver that insofar as nonparty decedent William Egan (Egan) bequeathed his shares of B&G to Pappas prior to his death, Pappas owns said shares, plaintiff THE ESTATE OF WILLIAM EGAN (EWE) does not, and as such, B&G's Partnership Agreement (PA) is inapplicable to the valuation of Egan's shares of B&G. Defendants oppose the instant motion asserting, inter alia, that pursuant to the PA, Egan was prohibited from transferring his shares of B&G such that upon his death, Egan's shares in B&G became property of EWE and the value of such shares are to be determined by the PA. Defendants also cross-move seeking an order pursuant to CPLR § 3212, granting them summary judgment on their counterclaim for specific performance. Significantly, defendants contend that since the PA precluded the transfer of Egan's shares in B&G to Pappas, upon Egan's death, pursuant to the PA, said shares became the property of EWE, and under the PA were immediately offered for sale to defendant EUGENE LEOGRANDE (Leogrande), who elected to purchase the shares. Since Leogrande accepted the foregoing offer, defendants seek summary judgment, thereby compelling defendants to consummate the sale of the foregoing shares. Plaintiffs oppose the cross-motion, inter alia, for the same reasons that they aver that the record warrants a declaratory judgment in their favor.
For the reasons that follow hereinafter, plaintiffs' motion is denied and defendants' cross-motion is granted.
The instant action is for the winding up of a partnership, an accounting, and partition. The complaint alleges that on October 16, 1991, Egan and Leogrande formed B&G. B&G owns real property located at 3738-3748 Third Avenue, Bronx, NY, 10456, consisting of two commercial premises, each housing three retail rental units. B&G also owns or owned several other corporations, including New York Giant Garage, L&E Laundromat Inc., and Wales Garage [*2]Group. Upon B&G's formation, pursuant to a general partnership agreement, Egan and Leogrande were B&G's sole partners, each owning 50 percent of B&G's shares. On September 24, 1993, Egan and Leogrande filed Articles of Co-Partnership with the New York Secretary of State. On June 15, 1994 Egan and Leogrande executed the PA. The only parties to the foregoing agreement were Egan and Leogrande. While the PA restricted the transfer of any interest in B&G during a partner's lifetime, treating any such transfer as an offer by the transferring partner to sell his interest to the other, the PA did not preclude any testamentary bequests. The PA further provided that a death of a partner would also constitute an offer by the deceased partner's estate to sell the deceased partner's shares of B&G to the remaining partner. To that end, the PA provided a methodology to establish the sale price of a deceased partner's interests in B&G held by the estate. The PA, however, did not prescribe a methodology to establish the value of any shares that were bequeathed to another. On April 29, 2020, Egan passed away. Prior to Egan's death, he bequeathed all of his rights, title and shares of stock interests to Pappas, a devisee of Egan's interest in B&G and the executor of EWE. Pappas' interest in B&G vested immediately upon Egan's death, thereby making him the owner of 50 percent of the shares in B&G. Upon Egan's death B&G was immediately dissolved, requiring that B&G be wound down, and entitling Pappas to an accounting to determine the value of Egan's interest in B&G. Since Egan's death, defendants have failed to provide Pappas with an accounting and have failed to provide him with the fair market value of his shares of B&G.
Based on the foregoing, plaintiffs interpose three causes of action. The first cause of action seeks to wind up B&G and alleges that the PA does not allow B&G to continue operating upon Egan's death. The second cause of action is for an accounting and alleges that Pappas, as executor of Egan's Estate, has standing to seek a final accounting of all of the partnership's assets. In addition, Pappas, as devisee of Egan's interest in B&G, with full title thereto, has a right to an accounting pursuant to New York Partnership Law § 74, to ascertain the fair market value of his 50 percent interest in B&G. The third cause of action seeks a partition pursuant to RPAPL § 901 and the sale of B&G's assets because B&G has refused to provide an accounting.
Within their amended answer, defendants interpose a counterclaim for specific performance wherein they allege the following. On June 15, 1994, Egan and Leogrande entered into the PA with respect to B&G. The PA states that no shareholder could "sell, transfer, pledge, hypothecate, negotiate, assign, mortgage, or otherwise dispose of or encumber," any of his shares of B&G. With respect to permissible lifetime transfers of a partner's shares of B&G, the PA prescribed a mandatory procedure for the same. Additionally, the PA states that upon the death of a partner, the same constituted an offer by the deceased partner's representative to sell the decedent's shares of B&G to the surviving partner. Upon the foregoing event, the surviving partner then had 12 months to elect to purchase the deceased partner's shares. Pursuant the PA, the price for the purchase of any shares is governed by the PA and the PA bound any heirs, executors, and administrators. On April 29, 2020, Egan died. On June 10, 2020, Leogrande, by letter, elected to purchase Egan's shares of B&G. Despite Leogrande's full performance, plaintiffs have refused to sell Egan's shares of B&G to Leogrande and contend that the valuation method prescribed by the PA is inapplicable. Based on the foregoing, defendants seek an order directing that plaintiffs sell Egan's shares to Leogrande in accordance with the terms of the PA. 
On October 6, 2021, the Court (McShan, J.) granted defendants' motion seeking dismissal of the instant action. Saliently, the Court concluded that each and every cause of action was precluded by the PA, which treated Egan's death as an offer to sell Egan's shares in [*3]B&G to Leogrande. Significantly, with respect to the cause of action for an accounting, the Court held that upon Egan's death, any and all property rights held by the estate were extinguished. 
On September 27, 2022, the Appellate Division, First Department modified the Court's decision solely to the extent of reinstating the second cause of action seeking an accounting. Specifically the Appellate Division stated that
the second cause of action for an accounting should not have been dismissed. Partnership Law § 74 states, "The right to an account of his interest shall accrue to any partner, or his legal representative, as against the winding up partners or the surviving partners at the date of dissolution, in the absence of an agreement to the contrary. The record contains no agreement to the contrary. B & G was dissolved by Egan's death. The representative of a deceased partner has the right to demand an accounting from the surviving partners upon completion of the winding up of the partnership affairs
(Pappas v B & G Holding Co., 208 AD3d 1105, 1106 [1st Dept 2022] [internal citations and quotation marks omitted]).
On February 14, 2024, after a conference where the parties agreed to have this Court determine "the applicability of the Partnership Agreement," this Court issued a Compliance Conference Order, allowing the parties to brief the foregoing issue [FN1]
.
PLAINTIFFS' MOTION
Plaintiffs' motion seeking an order declaring, inter alia, that Egan's shares of B&G were bequeathed to Pappas, such that the PA does not apply to, inter alia, determine the value of the shares is denied. Significantly, here, the record demonstrates that pursuant to the PA, Egan was proscribed from bequeathing his shares of B&G to Pappas, such that said shares are now owned by EWE, and therefore, inter alia, their value must be determined pursuant to the PA, as opposed to an accounting.

Standard of Review
CPLR § 3001 provides, in relevant part, that
[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. If the court declines to render such a judgment it shall state its grounds.
Generally, a declaratory judgment is intended to declare the respective legal rights of the parties based on specific facts and is not intended to declare findings of fact (Touro College v Novus University Corp., 146 AD3d 679, 679-680 [1st Dept 2017]; Thome v Alexander & Louisa Calder Found., 70 AD3d 88, 100 [1st Dept 2009]). Stated differently, the general purpose of a [*4]declaratory judgment is to quiet or stabilize an uncertain or disputed jural relation concerning present or prospective obligations (James v Alderton Dock Yards, 256 NY 298, 305 [1931]; Touro College at 679). Thus, a declaratory judgment requires a justiciable controversy, in which the plaintiff has an interest sufficient to constitute standing to maintain the action and that such "controversy involve present, rather than hypothetical, contingent or remote, prejudice to plaintiffs (Am. Ins. Ass'n v Chu, 64 NY2d 379, 383 [1985]; Touro College at 680). A declaratory judgment should only be granted if it will have a direct and immediate effect upon the rights of the parties (Enlarged City School Dist. of Middletown v City of Middletown, 96 AD3d 840, 841 [2d Dept 2012]; Matter of United Water New Rochelle, Inc. v City of New York, 275 AD2d 464, 466 [2d Dept 2000]). As such, a declaratory judgment is premature "when the future event is beyond the control of the parties and may never occur" (Enlarged City School Dist. of Middletown at 841; AB Oil Services, Ltd. v TCE Insurance Services, Inc., 188 AD3d 624, 626 [2d Dept 2020]). Whether to grant a declaratory judgment rests wholly within the court's discretion (Morgenthau v Erlbaum, 59 NY2d 143, 148 [1983]; American News Co. v Avon Pub. Co., 283 AD 1041, 1042 [1st Dept 1954]).
Generally, the proponent of a declaratory judgment must establish entitlement to summary judgment on the claims for which a declaratory judgment is sought (Russell v Town of Pittsford, 94 AD2d 410, 412 [4th Dept 1983] ["Summary judgment is proper in a declaratory judgment action where the record presents undisputed facts."]; Gen. Motor and Truck Repair, Inc. v HOP Energy, LLC, 100 AD3d 960, 960 [2d Dept 2012] ["The plaintiffs failed to establish their prima facie entitlement to judgment as a matter of law on so much of the complaint as sought certain declaratory and injunctive relief. Accordingly, the Supreme Court properly denied their motion, in effect, for summary judgment on those causes of action, regardless of the sufficiency of the defendants' opposition papers."]; Law Research Serv., Inc. v Honeywell, Inc., 31 AD2d 900, 901 [1st Dept 1969] ["The summary judgment and partial summary judgment procedure has also been utilized in a declaratory judgment action"]).
The proponent of a motion for summary judgment carries the initial burden of tendering sufficient admissible evidence to demonstrate the absence of a material issue of fact as a matter of law (Alvarez v Prospect Hospital, 68 NY2d 320, 324 [1986]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). Thus, a defendant seeking summary judgment must establish prima facie entitlement to such relief by affirmatively demonstrating, with evidence, the merits of the claim or defense, and not merely by pointing to gaps in plaintiff's proof (Mondello v DiStefano, 16 AD3d 637, 638 [2d Dept 2005]; Peskin v New York City Transit Authority, 304 AD2d 634, 634 [2d Dept 2003]). There is no requirement that the proof be submitted by affidavit, but rather that all evidence proffered be in admissible form (Muniz v Bacchus, 282 AD2d 387, 388 [1st Dept 2001], revd on other grounds Ortiz v City of New York, 67 AD3d 21, 25 [1st Dept 2009]). Notably, the court can consider otherwise inadmissible evidence, when the opponent fails to object to its admissibility and instead relies on the same (Niagara Frontier Tr. Metro Sys. v County of Erie, 212 AD2d 1027, 1028 [4th Dept 1995]), or when the opponent fails to object to the admission of such evidence (Bank of New York Mellon v Gordon, 171 AD3d 197, 202 [2d Dept 2019] ["However, as a general matter, a court should not examine the admissibility of evidence submitted in support of a motion for summary judgment unless the nonmoving party has specifically raised that issue in its opposition to the motion."]; see Greene v Kevin D. Greene, LLC, 188 AD3d 1012, 1013 [2d Dept 2020]; Rosenblatt v St. George Health and Racquetball Assoc., LLC, 119 AD3d 45, 55 [2d Dept 2014] ["Thus, the Supreme Court erred [*5]when it, sua sponte, determined that the plaintiff's deposition transcript was inadmissible because of the lack of a certification and, as a result, concluded that Eastern Athletic had failed to meet its prima facie burden."]). The latter is premised on the well settled principle that a court ought not raise arguments never raised by the parties themselves (Misicki v Caradonna, 12 NY3d 511, 519 [2009] ["We are not in the business of blindsiding litigants, who expect us to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made."]). 
Once movant meets his initial burden on summary judgment, the burden shifts to the opponent who must then produce sufficient evidence, generally also in admissible form, to establish the existence of a triable issue of fact (Zuckerman at 562). It is worth noting, however, that while the movant's burden to proffer evidence in admissible form is absolute, the opponent's burden is not. As noted by the Court of Appeals,
[t]o obtain summary judgment it is necessary that the movant establish his cause of action or defense 'sufficiently to warrant the court as a matter of law in directing summary judgment' in his favor, and he must do so by the tender of evidentiary proof in admissible form. On the other hand, to defeat a motion for summary judgment the opposing party must 'show facts sufficient to require a trial of any issue of fact.' Normally if the opponent is to succeed in defeating a summary judgment motion, he too, must make his showing by producing evidentiary proof in admissible form. The rule with respect to defeating a motion for summary judgment, however, is more flexible, for the opposing party, as contrasted with the movant, may be permitted to demonstrate acceptable excuse for his failure to meet strict requirement of tender in admissible form. Whether the excuse offered will be acceptable must depend on the circumstances in the particular case
(Friends of Animals v Associated Fur Manufacturers, Inc., 46 NY2d 1065, 1067-1068 [1979] [internal citations omitted]). Accordingly, generally, if the opponent of a motion for summary judgment seeks to have the court consider inadmissible evidence, he must proffer an excuse for failing to submit evidence in admissible form (Johnson v Phillips, 261 AD2d 269, 270 [1st Dept 1999]).
When deciding a summary judgment motion the role of the Court is to make determinations as to the existence of bonafide issues of fact and not to delve into or resolve issues of credibility. As the Court stated in Knepka v Talman (278 AD2d 811, 811 [4th Dept 2000]),
[s]upreme Court erred in resolving issues of credibility in granting defendants' motion for summary judgment dismissing the complaint. Any inconsistencies between the deposition testimony of plaintiffs and their affidavits submitted in opposition to the motion present issues for trial
(see also Yaziciyan v Blancato, 267 AD2d 152, 152 [1st Dept 1999]; Perez v Bronx Park Associates, 285 AD2d 402, 404 [1st Dept 2001]). Accordingly, the Court's function when determining a motion for summary judgment is issue finding, not issue determination (Sillman v Twentieth Century Fox Film Corp., 3 NY2d 395, 404 [1957]). Lastly, because summary judgment is such a drastic remedy, it should never be granted when there is any doubt as to the existence of a triable issue of fact (Rotuba Extruders v Ceppos, 46 NY2d 223, 231 [1978]). When the existence of an issue of fact is even debatable, summary judgment should be denied [*6](Stone v Goodson, 8 NY2d 8, 12 [1960]).

 Applicable Law
It has long been held that absent a violation of law or some transgression of public policy, people are free to enter into contracts, making whatever agreement they wish, no matter how unwise they may seem to others (Rowe v Great Atlantic & Pacific Tea Company, Inc., 46 NY2d 62, 67-68 [1978]). Consequently, when a contract dispute arises, it is the court's role to enforce the agreement rather than reform it (Grace v Nappa, 46 NY2d 560, 565 [1979]). In order to enforce the agreement, the court must construe it in accordance with the intent of the parties, the best evidence of which being the very contract itself and the terms contained therein (Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]). It is well settled that "when the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (Vermont Teddy Bear Co., Inc. v 583 Madison Realty Company, 1 NY3d 470, 475 [2004] [internal quotation marks omitted]). Moreover, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield at 569). Accordingly, courts should refrain from interpreting agreements in a manner which implies something not specifically included by the parties, and courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing (Vermont Teddy Bear Co., Inc. at 475). This approach serves to preserve "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses [and] infirmity of memory" (Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995] [internal quotation marks omitted]).
The proscription against judicial rewriting of contracts is particularly important in real property transactions, where commercial certainty is paramount, and where the agreement was negotiated at arm's length between sophisticated, counseled business people (Vermont Teddy Bear Co., Inc. at 475). Specifically, in real estate transactions, parties to the sale of real property, like signatories of any agreement, are free to tailor their contract to meet their particular needs and to include or exclude those provisions which they choose. Absent some indicia of fraud or other circumstances warranting equitable intervention, it is the duty of a court to enforce rather than reform the bargain struck (Grace v Nappa, 46 NY2d 560, 565 [1979]).
In the absence of fraud or other wrongful act, a party who signs a written contract is presumed to know and have assented to the contents therein (Pimpinello v Swift & Co., 253 NY 159, 162 [1930]; Metzger v Aetna Ins. Co., 227 NY 411, 416 [1920]; Renee Knitwear Corp. v ADT Sec. Sys., 277 AD2d 215, 216 [2d Dept 2000]; Barclays Bank of New York, N.A. v Sokol, 128 AD2d 492, 493 [2d Dept 1987]; Slater v Fid. & Cas. Co. of NY, 277 AD 79, 81 [1st Dept 1950]). In discussing this long-standing rule the court in Metzger stated that
[i]t has often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not. Ignorance through negligence or inexcusable trustfulness will not relieve a party from his contract obligations. He who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them and there can be no evidence for the jury as to his understanding of its terms. This rule is as applicable to insurance contracts as to contracts of any kind.
(Metzger at 416 [internal citations omitted]).
Provided a writing is clear and complete, evidence outside its four corners "as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (W.W.W. Assoc., Inc. v Giancontieri, 77 NY2d 157, 162 [1990]; see Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002]; Mercury Bay Boating Club Inc. v San Diego Yacht Club, 76 NY2d 256, 269-270 [1990]; Judnick Realty Corp. v 32 W. 32nd St. Corp., 61 NY2d 819, 822 [1984]). Whether a contract is ambiguous is a matter of law for the court to decide (id. at 162; Greenfield at 169; Van Wagner Adv. Corp. v S & M Enterprises, 67 NY2d 186, 191 [1986]). A contract is unambiguous if the language it uses has "definite and precise meaning, unattended by danger of misconception in purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion" (Greenfield at 569; see Breed v Ins. Co. of N. Am., 46 NY2d 351, 355 [1978]). Hence, if the contract is not reasonably susceptible to multiple meanings, it is unambiguous and the court is not free to alter it, even if such alteration reflects personal notions of fairness and equity (id. at 569-570). Notably, it is well settled that silence, or the omission of terms within a contract are not tantamount to ambiguity (id. at 573; Reiss v Financial Performance Corp., 97 NY2d 195, 199 [2001]). Instead, the question of whether an ambiguity exists must be determined from the face of an agreement without regard to extrinsic evidence (id. at 569-570), and an unambiguous contract or a provision contained therein should be given its plain and ordinary meaning (Rosalie Estates, Inc. v RCO International, Inc., 227 AD2d 335, 336 [1st Dept 1996]). 
Notably, while the parol evidence rule forbids proof of extrinsic evidence to contradict or vary the terms of a written instrument, it has no application in a suit brought where there are claims of fraud in the execution of an agreement or to rescind a contract on the ground of fraud (Sabo v Delman, 3 NY2d 155, 161 [1957]; Adams v Gillig, 199 NY 314, 319 [1910]; Berger-Vespa v Rondack Bldg. Inspectors Inc., 293 AD2d 838, 840 [3d Dept 2002]).

 Discussion
In support of the instant motion, plaintiffs submit a Business Certificate for Partners, dated October 16, 1991. The same evinces that Egan and Leaogrande were B&G's only partners.
Plaintiffs submit the PA. The PA is dated June 15, 1994, and evinces that it is between Egan and Leogrande, as partners of B&G, each owning 50 percent interest in B&G. The agreement also governs the ownership of three nonparty corporations, each owned by Egan and Leogrande, who each own 50 shares of the 200 common shares issued by the three corporations. Pursuant to paragraph 2(A),
[n]o Shareholder shall sell, transfer, pledge, hypothecate, negotiate, assign, mortgage or otherwise dispose of or encumber (hereinafter "Transfer") any of his Shares, except in accordance with the terms and conditions set forth in this Agreement. No Partner shall sell, transfer, pledge, hypothecate, negotiate, assign, mortgage or otherwise dispose of or encumber any of his interest in the Partnership, except in accordance with this Agreement.
Pursuant to paragraph 2(B), if a shareholder sought to transfer his partnership interest in B&G, "notice of such election shall be given by the sending of a written communication, by certified or registered mail, return receipt requested, postage prepaid, to the other Shareholder or Partner." Thereafter, pursuant to Paragraph 2(C), the non-selling partner was granted the option to purchase the selling partner's interest, such election to be made within 30 days of the notice required by paragraph 2(b). In the event of the foregoing, pursuant to paragraph 2(G), the [*7]purchase price of the selling partner's shares is determined by paragraphs 5 and 6 of the PA. Pursuant to paragraph 4(A),
[t]he death of a Shareholder or Partner shall constitute an offer of the personal representative of such deceased Shareholder's or Partner's estate to sell all of his Shares or Partnership Interest held by the estate of the deceased Shareholder in the Corporations and Interest in the Partnership. If the surviving Shareholder does not elect to purchase all four businesses from the estate and within twelve (12) months of death the estate then elects to sell its interest, the surviving Partner/Shareholder must purchase all four businesses. The purchase price is set forth in paragraph 5.
Pursuant to paragraph 4(B), "[e]ach Shareholder and Partner may apply for and own life insurance on the life of the other Shareholder or Partner." Whether the non-selling partner elects to purchase a selling partner's shares of B&G or if the death of a partner triggers an offer to sell said partner's shares to the surviving partner, paragraph 5(A) states that the price of said shares will be the stipulated value of the shares as defined by paragraph 5(B) or the amount of any insurance proceeds received by the surviving partner from the deceased partner's insurance policies. Pursuant to paragraph 5(B)(i), the stipulated value of a partner's shares is that listed within a Certificate of Valuation, provided that said certificate is no more than a year old. Per paragraph 5(b)(ii), if at anytime the value of a partner's shares must be calculated and the Certificate of Valuation is less than a year old, then the stipulated value "is the actual gross rental from the total of all assets owned by the Corporations and Partnership for the twelve (12) months immediatelu preceding the valuation date and multiplying said gross rents for said twelve (12) month period by a multiple of eight (8)." Pursuant to paragraph 6, which prescribes the terms of payment upon a sale of a partner's shares of B&G, upon the sale of partner's shares to the other, the lesser of 20 percent of the purchase price or $100,000 is payable in cash or certified check, within of the expiration of the last option to purchase the shares. Any balance then remaining shall be paid in installments, which unless there is a disability, shall not exceed 120 installments. On April 1, 2013, the PA was amended to reflect that the stipulated value defined by paragraph 5 would be reduced by the "net of any outstanding mortgage on a parcel of real property owned by" B&G.
Plaintiffs submit a will dated September 11, 2009. The same evinces that Egan "devise[d] and bequeath[ed] all [his] right, title, shares of stock and interest in B & G Holding, Company to DEAN GEORGE PAPPAS, outright, absolutely and forever."
Plaintiffs submit a Certificate of Death, evincing that on April 29, 2020, Egan died.
Based on the foregoing, plaintiffs application must be denied since the very evidence submitted by them, namely the PA to which Egan was bound, proscribed the transfer of Egan's shares of B&G. As such, the bequeath of said shares to Pappas was a nullity. 
As noted above, a declaratory judgment is intended to declare the respective legal rights of the parties based on specific facts and is not intended to declare findings of fact (Touro College at 679-680; Thome at 100). Stated differently, the general purpose of a declaratory judgment is to quiet or stabilize an uncertain or disputed jural relation concerning present or prospective obligations (James at 305; Touro College at 679). The proponent of a declaratory judgment must establish entitlement to summary judgment on the claims for which a declaratory judgment is sought (Russell at 412; Gen. Motor and Truck Repair, Inc. at 960; Law Research [*8]Serv., Inc. at 901).
To that end, the proponent of a motion for summary judgment carries the initial burden of tendering sufficient admissible evidence to demonstrate the absence of a material issue of fact as a matter of law (Alvarez at 324; Zuckerman at 562). Thus, the proponent of summary judgment must establish prima facie entitlement to such relief by affirmatively demonstrating, with evidence, the merits of the claim or defense, and not merely by pointing to gaps in the opponent's proof (Mondello at 638; Peskin at 634).
Here, in order to declare to what extent the PA applies, the Court must first determine whether Pappas or EWE now own Egan's shares of B&G. To that end, the PA evinces that Egan and Leogrande were B&G's sole partners, each owning a 50 percent interest in B&G. More importantly, paragraph 2(A) of the PA clearly and unequivocally states that "[n]o Shareholder shall sell, transfer, pledge, hypothecate, negotiate, assign, mortgage or otherwise dispose of or encumber (hereinafter "Transfer") any of his Shares, except in accordance with the terms and conditions set forth in this Agreement." Further, per paragraph 2(B) of the PA, when a partner sought to transfer his shares, "notice of such election [must] be given by the sending of a written communication, by certified or registered mail, return receipt requested, postage prepaid, to the other Shareholder or Partner." Thus, paragraph 2(A)of the PA clearly and unambiguously proscribes not only the transfer of a partner's share, but the mere pledge and/or assignment of the same.
Again, when a contract dispute arises, it is the court's role to enforce the agreement rather than reform it (Grace at 565). Thus, in order to enforce the agreement, the court must construe it in accordance with the intent of the parties, the best evidence of which being the very contract itself and the terms contained therein (Greenfield at 569). "[W]hen the parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms" (Vermont Teddy Bear Co., Inc. at 475 [internal quotation marks omitted]). Accordingly, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield at 569).
Here, contrary to plaintiffs' assertion, the terms of the PA proscribe the bequeath of Egan's shares to Pappas. This is true, despite, as urged, that there is no language in the PA proscribing the testamentary disposition of a partner's shares. Indeed, plaintiffs' suggestion that where, as here, the PA clearly proscribed the transfer, pledge, and/or assignment of a partner's shares, such terms did not necessarily include a testamentary disposition, is absurd and turns the well settled principles of contract jurisprudence on their head. Accordingly, contrary to plaintiffs' assertion, because at the time of his death Egan owned his shares of B&G and his conveyance to Pappas was a nullity, the shares did not pass outside the estate and instead, became EWE's property. 
To be sure, SCPA § 103(19) defines a decedent's estate as "[a]ll of the property of a decedent, trust, absentee, internee or person for whom a guardian has been appointed as originally constituted, and as it from time to time exists during administration." Moreover, SCPA § 103(44) defines property as "[a]nything that may be the subject of ownership and is real or personal property, or is a chose in action." Hence, here, at the time of his death, Egan, precluded from transferring his shares of B&G by the PA, owned them and upon his death they became part of EWE (EPTL § 4-1.1 ["The property of a decedent not disposed of by will shall be distributed as provided in this section"), and per section 4(A), triggered an offer to Leogrande to purchase them.
The foregoing is nothing new, and much as this Court does here, courts routinely determine what property was properly alienated by a decedent to determine whether it passed to the state by intestacy (Bently v Dox, 295 AD2d 952, 953 [4th Dept 2002] [Court held that certificates of deposit gifted to plaintiff prior to decedent's death was ineffectual and thus part of decedent's estate. Specifically the Court held that "[w]ithout actual delivery of the funds to the alleged donees, which in the present circumstances could readily have been accomplished ..., the alleged inter vivos gifts were never completed during the lifetime of the decedent, and thus, the funds must be returned to the estate."]; cf. Matter of In re Rokeach, 101 AD3d 1022, 1024 [2d Dept 2012] [Court held that decedent's estate which sought to recover real property and securities from respondents could not recover the same inasmuch as they had been properly conveyed to respndents prior to decedent's death. The court held that "[h]ere, the moving respondents demonstrated that the cash and securities identified in the petition were validly transferred in 1996 and 1997, by personal checks made out by the decedent and identified as 'gifts.' The Zaltz respondents also demonstrated that the decedent transferred her remaining interest in the subject real property by deed dated July 6, 2000, and the petitioner concedes, in the petition, that she was aware of this transfer by 'early 2002.' These submissions were sufficient to demonstrate, prima facie, that the decedent did not possess any interest in either the subject real property or the cash and securities identified in the petition."]; In re Rice's Estate, 281 AD 945, 945 [4th Dept 1953] [Court held that proceed of a joint account opened by a husband and wife became the property of the wife upon his death, such that they were not part of the husband's estate. The court held that "[a]ccordingly, we find and determine that in the absence of evidence to the contrary the proceeds of this account became the sole property of the wife, Nancy C. Rice, by right of survivorship, upon the death of her husband and, therefore, form no part of his estate."]). The issue here is no different and it is precisely what plaintiffs seeks to have the Court determine.
Nor is there any merit to plaintiffs' contention that the bequeath by Egan did not violate the PA because "testamentary bequests may be withdrawn or modified at any time prior to death and therefore convey no title or interests until death" (NY St Cts Elec Filing [NYSCEF} Doc No. 123, at 6, Affirmation in Support of Plaintiffs' Motion for a Declaratory Judgment). Not only is there no legal support for such contention, but again, the law applicable to contract interpretation, as noted above, proscribes the assignment or pledging of a partner's shares, which is exactly what a testamentary disposition is. If bequeathing property in a will is not a pledge or an assignment, albeit, not an immediate one, then nothing is.
Lastly, while it is true, as urged by plaintiffs, "that because a will is ambulatory in nature and because a testator has the right to freely revoke a will until death, an agreement not to revoke a prior will demands the most indisputable evidence of agreement" (Matter of Am. Comm. for Weizmann Inst. of Science v Dunn, 10 NY3d 82, 92 [2008]; Blackmon v Estate of Battcock, 78 NY2d 735, 739 [1991] ["We begin with the fundamental proposition that a will is ambulatory in nature and is ordinarily revocable during the life of the testator. Even after due execution of a will, testators also retain unfettered authority to dispose of all property during their lifetimes. Individuals may by agreement, however, validly surrender their power of revocation. On the other hand, the law strictly scrutinizes the renunciation of the right to revoke a will and requires a threshold showing of clear and unambiguous evidence to give effect to this surrender of rights" [internal citations omitted]), these legal principals have no application here. Indeed, it is hard to fathom why plaintiff raises this argument. To be sure, Matter of Am. Comm. for Weizmann Inst. [*9]of Science and Blackmon stands for the proposition that an agreement not to revoke a will must be clear and unequivocal. Here, however, where nothing in the record evinces that Egan pledged not to revoke a prior will, the facts are inapposite. 
Lastly, to the extent that the PA constitutes an agreement to waive the right to make a testamentary bequest of Egan's shares of B&G, which it is, the PA accomplishes the same. Significantly, "[a] waiver is the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it (Aron Law PLLC v Town of Fallsburg, 199 AD3d 1286, 1286 [3d Dept 2021]; see Homapour v Harounian, 200 AD3d 575, 574 [1st Dept 2021]; Matter of Chenango Forks Cent. School Dist. v New York State, 95 AD3d 1479, 1484, affd, 21 NY3d 255 [2013]), which must be established clearly, unmistakably, and without ambiguity (Aron Law PLLC at 1286; Matter of Chenango Forks Cent. School Dist. at 1484). Thus, here, rather than negate any waiver of the right to bequeath Egan's shares of B&G to Pappas, plaintiffs' own evidence, namely the PA, evinces the opposite, that Egan by binding himself to paragraph 2A, proscribing the transfer, pledging, or assignment of his shares, did, in fact, waive his right to make any testamentary dispositions. As such, the bequeath to Pappas was a nullity, never divesting Egan of his shares, such that at the time of his death his shares passed to EWE under the laws of intestate distribution. 
Accordingly, plaintiffs fail to establish prima facie entitlement to summary judgment on their claim, which seeks declaration that the PA did not proscribe the bequeath of Egan's shares of B&G to Pappas. This shortcoming, the sine qua non to all the other declarations sought, namely - that (1) title in Egan's shares in B&G vested in Pappas as a specific devisee upon Egan's death; (2) Egan's shares in B&G passed outside of Egan's estate; (3) there are no valuation provisions in the PA applicable to the valuation of shares that pass to a specific devisee; and (4) because the PA states no applicable limitations or methodology for the valuation of specific bequests, it does not control the valuation of Egan's shares held by the Pappas - is fatal, requiring that the Court resolve the foregoing declarations in defendants' favor.
Because plaintiffs ail to establish prima facie entitlement to summary judgment, the Court need not consider the sufficiency of any papers submitted in opposition to this motion (Winegrad v New York University Medical Center, 64 NY2d 851, 853 [1985]).

 DEFENDANTS' CROSS-MOTION
Defendants' cross-motion seeking summary judgment on their counterclaim for specific performance is granted. Significantly, defendants establish that the PA precluded the testamentary disposition of Egan's shares and that because EWE owns said shares, despite Leogrande's performance of all obligations under the PA to purchase said shares from EWE and determine their value pursuant to the PA, plaintiffs have refused to perform their obligations under the PA. 

Applicable Law
Specific performance is an appropriate remedy when money damages would prove inadequate to protect the injured party and when "disproportionate or inequitable burden on the breaching party" (Cho v 401-403 57th St. Realty Corp., 300 AD2d 174, 175 [1st Dept 2002]; see Sokoloff v Harriman Estates Dev. Corp., 96 NY2d 409, 415 [2001]). Whether to award specific performance is decision that is wholly within the discretion of the trial court and requires a determination that money damages would be an inadequate remedy (Sokoloff at 415; Cho at 175). Thus, the court must consider, inter alia, "the difficulty of proving damages with [*10]reasonable certainty and of procuring a suitable substitute performance with a damages award" (Sokoloff at 415; Cho at 175). In order to establish entitlement to summary judgment, the proponent of specific performance must establish substantial performance of his/her obligations under the contract and that he/she is ready, willing, and able to perform any obligations not yet performed (Dixon v Malouf, 70 AD3d 763, 763 [2d Dept 2010];Israel v Charnews, 46 AD3d 753, 754 [2d Dept 2007]; Lieberman Properties, Inc. v Braunstein, 134 AD2d 55, 60 [2d Dept 1987]; Hadcock Motors, Inc. v Metzger, 92 AD2d 1, 5 [4th Dept 1983]), and that there is no adequate remedy at law (E & D Group, LLC v Vialet, 134 AD3d 981, 983 [2d Dept 2015]; Liberty Affordable Hous., Inc. v Maple Ct. Apartments, 125 AD3d 85, 92 [4th Dept 2015]; EMF Gen. Contr. Corp. v Bisbee, 6 AD3d 45, 51 [1st Dept 2004]).

 Discussion
In support of the cross-motion, defendants submit the PA, and the Business Certificate for Partners, also submitted by plaintiffs and discussed above.
Defendants also submit an affidavit by Leogrande, wherein he states, in relevant part, as follows. B&G was formed by Leogrande on October 16, 1991, with Egan and Leogrande as the only partners. On June 15, 1994, Egan and Leogrande excuted the PA, which remained unchanged until April 1, 2013. On April 29, 2020, Egan died and upon learning that Pappas was the administrator of EWE, on June 10, 2020, Leogrande sent Pappas a letter electing to purchase Egan's shares of B&G. On July 10, 2020, Pappas' counsel responded that he was reviewing the file. On July 29, 2020, Leogrande sent another letter to Pappas, reiterating his election to purchase Egan's shares of B&G at the price to be calculated using the PA. Pappas disagreed that the PA governed the valuation of Egan's shares and wanted a list of B&G's assets.
Defendants submit the letters referenced in Leogrande's affidavit, namely the letter dated June 10, 2020, which evinces that, by counsel, Leogrande elected to purchase Egan's shares of B&G for $318,348, said sum calculated pursuant to paragraph 5 of the PA. The letter dated July 10, 2020, evinces that Pappas, by counsel, was reviewing the file.
Based on the foregoing, Leogrande establishes prima facie entitlement to summary judgment on its counterclaim for specific performance. 
Again, as noted above, the evidence submitted by plaintiffs fails to establish, as urged, that Egan successfully bequeathed his shares of B&G to Pappas. Instead, despite the will submitted by plaintiffs, the PA, with its proscription against the transfer in the will, precluded the foregoing bequeath to Egan, rendering it a nullity. Having determined that per the PA, Egan's shares of B&G are owned by EWE, his death, per paragraph 4 of the PA, constituted an offer to sell the same to Leogrande at a value to be determined by paragraph 5 of the PA. 
The foregoing, coupled with Leogrande's affidavit and the letter he sent to Pappas electing to purchase Egan's shares of B&G at a value calculated by the PA ,establishes defendants' prima facie entitlement to summary judgment on the counterclaim for specific performance. 
Again, in order to establish entitlement to summary judgment, the proponent of specific performance must establish substantial performance of his/her obligations under the contract and that he/she is ready, willing, and able to perform any obligations not yet performed (Dixon at 763; Israel at 754; Lieberman Properties, Inc. at 60; Hadcock Motors, Inc. at 5, and that there is no adequate remedy at law (E & D Group, LLC at 983; Liberty Affordable Hous., Inc. at 92; EMF Gen. Contr. Corp. at 51).
Here, pursuant to paragraph 4(B) of the PA, upon the death of a partner of B&G, such [*11]event constitutes an offer by the deceased partner's personal representative to sell all Egan's shares in B&G and all corporations described in the PA. Pursuant to the same paragraph, the surviving partner must then elect to purchase the shares within 12 months of the foregoing offer, meaning the death of the deceased partner. With regard to the value of the shares, paragraph 5(A) states that the price of said shares will be the stipulated value of the shares as defined by paragraph 5(B) or the amount of any insurance proceeds received by the surviving partner from the deceased partner's insurance policies. Pursuant to paragraph 5(B)(i), the stipulated value of a partner's shares is that listed within a Certificate of Valuation, provided that said certificate is no more than a year old. Per paragraph 5(b)(ii), if at anytime the value of a partner's shares must be calculated and the Certificate of Valuation is less than a year old, then the stipulated value "is the actual gross rental from the total of all assets owned by the Corporations and Partnership for the twelve (12) months immediately preceding the valuation date and multiplying said gross rents for said twelve (12) month period by a multiple of eight (8)."
Here, on June 10, 2020, less than two months after Egan died, Leogrande exercised his option under the PA to purchase Egan's shares of B&G, by conveying the same, in writing, to Pappas, the administrator of EWE. Despite the foregoing, constituting Leogrande's performance under the PA, plaintiffs have refused to consummate the agreement, asserting, as evinced by this action, that Egan's shares of B&G are owned by Pappas, such that the value of the same are not governed by the PA. Since the Court has decided the foregoing issue against plaintiffs, Leogrande, by electing to purchase Egan's shares from EWE, has substantially performed under the PA, and stands ready willing and able to perform the remaining obligations under the PA, namely the tender of payment for the shares. Thus, defendants establish prima facie entitlement to summary judgment on the counterclaim for specific performance.
Nothing submitted by plaintiffs raises an issue of fact sufficient to preclude summary judgment.
To the extent that plaintiffs argue that Leogrande's affidavit is impermissible parole evince, this contention is without merit. 
It is true that if a writing is clear and complete, evidence outside its four corners "as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (W.W.W. Assoc., Inc. at 162; see Greenfield at 569; Mercury Bay Boating Club Inc. at 269-270; Judnick Realty Corp. at 822). Here, because the Court holds that the PA is clear and unambiguous it would not and did not consider any evidence outside its four corners to interpret and apply the terms therein. To that end, the only portions of Leogrande's affidavit considered by the Court were those relating to Egan's death and Leogrande's offer to purchase the shares thereafter.
For this same reason, plaintiffs argument seeking to exclude Leogrande's affidavit in its entirety on grounds that it violates the Dead Man's Statute is also without merit. 
CPLR § 4519, states, in relevant part, that
[u]pon the trial of an action or the hearing upon the merits of a special proceeding, a party or a person interested in the event, or a person from, through or under whom such a party or interested person derives his interest or title by assignment or otherwise, shall not be examined as a witness in his own behalf or interest, or in behalf of the party succeeding to his title or interest against the executor, administrator or survivor of a deceased person or the committee of a person with a mental illness, or a person deriving his title or interest from, through or under a deceased person or person with a mental [*12]illness, by assignment or otherwise, concerning a personal transaction or communication between the witness and the deceased person or person with a mental illness, except where the executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf, or the testimony of the person with a mental illness or deceased person is given in evidence, concerning the same transaction or communication.
Thus, CPLR § 4519 precludes an interested party from testifying about transactions with a decedent or one deemed incompetent to testify. As noted by the court in Matter of Wood's Estate, (52 NY2d 139 [1981]),
[t]he statute prevents any person "interested in the event" from testifying to a "personal transaction" with the deceased unless the representative of the deceased has waived the protection of the statute by testifying himself or introducing the testimony of the decedent into evidence at trial
(id. at 144). The rationale for the statute is that it
prevent[s] a party or one interested in the event giving testimony as to personal transactions or communications with a deceased person, is that the deceased cannot confront the survivor, or give his version of the affair, or expose the omissions, mistakes, or falsehoods of the survivor
(Burke v Higgins, 178 AD 816, 820 [1st Dept 1917]). Notably, the protection accorded by the statute can be waived when the decedent's estate, representative, or the person seeking to avail itself of the protection of the statute testifies concerning the transaction, which would otherwise be precluded or when the party who would otherwise benefit from the statute elicits testimony regarding the otherwise precluded transaction (Matter of Wood's Estate at 145 ["By the terms of the statute, the representative of a decedent's estate waives the protection of the statute if he testifies in his own behalf concerning a personal transaction of his adversary with the deceased. Once having introduced testimony concerning that transaction into evidence, he cannot thereafter prevent his adversary from testifying to the details of the same transaction, for to do so would give the estate an unfair advantage not intended by the statute. Also, the executor cannot avoid a waiver by eliciting testimony from an interested party on the personal transaction in issue. It was long ago settled that when the executor questions his adversary as to all or part of a personal transaction with the decedent, he has opened the door as to that transaction and otherwise incompetent testimony is admissible to fully explain the personal transaction in issue. The purpose of this rule is to place the parties, insofar as is practical in light of the policy embodied in the statute, in relatively equivalent positions vis-a-vis the same transaction. This prevents the unfair use of the statute as a sword rather than a shield" [internal citation and quotation marks omitted]). 

Again, here, the Court did not consider anything in Leogrande's affidavit regarding conversations with Egan, especially those regarding transactions related to the execution of the PA and Egan's understanding of the same. Accordingly, the portions of Leogrande's affidavit, which the Court considered, are not precluded by the Dead Man's Statute. 
Accordingly, defendants' cross-motion is granted. It is hereby
ORDERED that within thirty (30) days of service upon them of this Decision and Order, [*13]with Notice of Entry, plaintiffs consummate the sale of Egan's shares of B&G in accordance with all terms in the PA, including the valuation method prescribed by paragraph 5. It is further
ORDERED that all parties appear for a Status Conference on October 7, 2024 at 10am. It is further
ORDERED that defendants serve a copy of this Decision and Order with Notice of Entry upon plaintiffs within 30 days hereof.
This constitutes this Court's decision and Order.
Dated : September 6, 2024
Bronx, New York
HON. FIDEL E. GOMEZ, JSC

Footnotes

Footnote 1:Ordinarily, where as, here, the complaint in this action is bereft of a cause of action for declaratory judgment, generally a prerequisite to the entertainment of an application seeking declaratory relief, the Court would not be authorized to grant such relief. However, here, where the parties have consented to have the Court determine whether the PA applies, the parties have consented to have the Court determine all the issues briefed by the parties.